Louis C. OSTRER, Rita Ostrer, Jack Ostrer, and Dina Gelman, Plaintiffs,

v.

William I. ARONWALD, Robert B. Fiske, Jr., Alan Naftalis, Marvin Sontag, James Killeen, Edward H. Levi, and the United States of America, Defendants.

No. 76 Civ. 3701.

United States District Court,
S. D. New York.

June 21, 1977.

See also, D.C., 425 F.Supp. 962, 434 F. Supp. 396.

Alan M. Dershowitz, Cambridge, Mass., for Louis C. Ostrer.

Silverglate, Shapiro & Gertner, Boston, Mass., for Rita Ostrer; Harvey A. Silverglate, Boston, Mass., of counsel.

Wynn & Atlas, New York City, for Jack Ostrer and Dina Gelman; Jeffrey M. Atlas, Richard H. Wynn, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for defendants; Gary G. Cooper, New York City, of counsel.

ROBERT J. WARD, District Judge.

Defendants William I. Aronwald, Robert B. Fiske, Jr., Alan Naftalis, Marvin Sontag, James Killeen, Edward H. Levi, and the United States of America move for an order pursuant to Rule 12(b), Fed.R.Civ.P., dismissing the complaint in this action. For the reasons hereinafter stated, the motion is granted.

Plaintiffs Louis C. Ostrer, his wife Rita Ostrer, his father Jack Ostrer, and his sister Dina Gelman bring this action seeking injunctive and other relief against certain government officials and the United States of America. They claim that the government is using unlawful and unethical means in an effort to coerce Louis C. Ostrer into testifying before a federal grand jury about his business associates, some of whom may have "connections with organized crime."

The complaint identifies the defendants as follows: Aronwald is employed by the United States Department of Justice and was Chief of the Organized Crime Strike Force for the Southern District of New York ("the Strike Force"). Naftalis also belonged to the Strike Force and is in charge of the investigation of which plaintiffs complain. Fiske is the United States Attorney for the Southern District of New York. Levi was the Attorney General of the United States. Both Sontag and Killeen were members of the Strike Force and are investigators with the Internal Revenue Service.

Plaintiffs seek to enjoin defendants from presenting any further evidence regarding plaintiffs to the grand jury, from obtaining indictments against plaintiffs prior to a hearing and decision on the merits, from seeking retaliation against plaintiffs or their immediate families, and from releasing to the news media and others incriminating stories about the plaintiffs.

In addition, plaintiffs ask the Court to order suppressed any evidence obtained by unlawful or unconstitutional means and the fruits thereof and to order the defendants to cease harassing and interfering with plaintiffs and their lawful activities and associations. Plaintiffs ask the Court to discharge the grand jury and to declare plaintiffs immunized with respect to the "alleged crimes, evidence being presented to, and indictments being sought from, the Grand Jury." Finally, the complaint demands an award of actual damages of twenty million dollars and punitive damages of thirty million dollars, plus litigation costs against the defendants jointly and severally.

The jurisdictional allegations of the complaint are lengthy. Listed are 18 U.S.C. § 2515 et seq.; the first, fourth, fifth, and sixth amendments to the Constitution; Rules 6, 41 and 42, Fed.R.Crim.P.; 28 U.S.C. §§ 2201, 2202, 1331, 1346, 1361 and

2241; 18 U.S.C. § 6001 *et seq.* and *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); as well as, "this Court's inherent supervisory powers over the Federal Courts, Federal judicial and quasi-judicial proceedings, grand juries, and officers of the Court." At the outset, the Court must determine whether jurisdiction exists.

■ The Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, does not confer subject matter jurisdiction. It provides a remedy where jurisdiction exists. *Arthur v. Nyquist,* 415 F.Supp. 904, 909 n. 3 (W.D.N.Y.1976).

■ 28 U.S.C. § 1346 is also pleaded as a jurisdictional base. The relevant portions of § 1346 read as follows:

United States as defendant

(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

.    .    .    .    .

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Insofar as this is a suit for non-monetary relief, 28 U.S.C. § 1346 does not provide a jurisdictional basis for plaintiffs. § 1346(b) relates solely to the recovery of "money damages." § 1346(a)(2) permits an award of damages, not injunctive or declaratory relief. *Lee v. Thornton,* 420 U.S. 139, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975) (per curiam). *Richardson v. Morris,* 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973).

§ 1346(a)(2) does not in itself establish a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Duarte v. United States,* 532 F.2d 850 (2d Cir. 1976). Further,

Tucker Act jurisdiction (28 U.S.C. § 1346(a)(2) is properly invoked where the claim does not exceed $10,000 or where the claimant waives any amount sought in excess of the Act's jurisdictional limit. *See Perry v. United States,* 308 F.Supp. 245 (D.Colo.1970), *aff'd,* 442 F.2d 353 (10th Cir. 1971).

*Commonwealth of Pennsylvania v. National Association of Flood Insurers,* 520 F.2d 11, 25 (3d Cir. 1975). As noted above, plaintiffs claim damages in the millions.

Regarding plaintiffs' allegation of jurisdiction under § 1346(b), defendants assert that plaintiffs have not filed an administrative claim, a prerequisite to suit. *Altman v. Connally,* 456 F.2d 1114, 1116 (2d Cir. 1972); *Heaton v. United States,* 383 F.Supp. 589, 590 (S.D.N.Y.1974). Plaintiffs apparently do not contest this assertion.

Moreover, it appears that plaintiffs' claims would fall within the discretionary acts exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). *See Myers & Myers, Inc. v. United States Postal Service,*

527 F.2d 1252, 1256–57 (2d Cir. 1975); *Smith v. United States,* 375 F.2d 243 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).

28 U.S.C. § 1361 reads as follows: Action to compel an officer of the United States to perform his duty

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

Traditionally, jurisdiction under this section arises only if the defendant has "a clear duty to perform a non-discretionary act." *Davis v. United States Dep't of HEW,* 416 F.Supp. 448, 451 (S.D.N.Y.1976). Conversely, mandamus is appropriate if the activity sought to be prevented is "so plainly prohibited as to be free from doubt." *Naporano Metal & Iron Co. v. Sec'y of Labor,* 529 F.2d 537, 542 (3d Cir. 1976).

This Circuit recently stated:

The prerequisites to the issuance of a writ of mandamus have been stated as (1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the defendant's part to do the act in question; and (3) lack of another available, adequate remedy.

*Billiteri v. United States Board of Parole,* 541 F.2d 938, 946 (2d Cir. 1976). This Court finds these prerequisites lacking.

In *Fifth Avenue Peace Parade Committee v. Hoover,* 327 F.Supp. 238, 243 (S.D.N.Y.1971), *aff'd,* 480 F.2d 326 (2d Cir. 1973), *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974), it was stated:

a court must have the benefit of some specific statutes or regulations against which to measure the duties said to have been specifically ignored by the defendant or defendants. Plaintiffs have not made such a showing here. They rest upon the flat assertion that defendants have a duty not to violate the constitutional rights of plaintiffs. Although the proposition cannot be denied, I think that to allow it as a basis for federal jurisdiction under § 1361 would be to stretch mandamus far beyond its proper limits. Here, plaintiffs similarly assert that defendants have a duty not to violate their civil rights and not to engage in activities which constitute crimes under state law.

In *Inmates of Attica Correctional Facility v. Rockefeller,* 477 F.2d 375, 379 (2d Cir. 1973), the Second Circuit refused mandamus to compel the United States attorney to investigate and prosecute certain state officers, indicating that to do so would be an unwise interference with prosecutorial discretion. This Court believes that mandamus is similarly unavailable to compel a United States attorney *not* to prosecute.

Plaintiffs claim to be "in custody" for purposes of this Court's power to grant a writ of habeas corpus. 28 U.S.C. § 2241. The incidents of this restraint are not detailed. In *Hensley v. Municipal Court,* 411 U.S. 345, 351, 93 S.Ct. 1571, 1574, 36 L.Ed.2d 294 (1973), the Supreme Court stated:

The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty. Since habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate.

*See United States ex rel. Scranton v. State of New York,* 532 F.2d 292 (2d Cir. 1976).

Two useful indicia of custody were suggested by the Court in *Whorley v. Brilhart,* 359 F.Supp. 539, 542 (E.D.Va.1973)

First, there must be present some sort of supervisory control over the person of the petitioner. His conduct, in other words, must be subject in one degree or another to the direction of judicial officers. Second, the existence of an imminent possibility of incarceration without a formal trial and criminal conviction may create such a restraint on liberty as to constitute custody. At the least, such a possibility taken together with even minimum su-

pervisory control would result in a finding of custody. *Hensley v. Municipal Court, [supra].*

There is certainly no imminent possibility of incarceration present here. Furthermore, plaintiffs' conduct is really not subject to the direction of judicial officers nor to their supervisory control as is the behavior of a parolee or one on probation.

Although the definition of "in custody" has clearly broadened over time, it remains a concept with limits. Plaintiffs would have this Court go beyond those limits. In sum, they are simply not subject to severe or immediate restraint.

■ 18 U.S.C. § 6001 *et seq.* "Immunity of Witnesses" does not appear to serve as a jurisdictional grant in an action of this sort. That portion of Title 18 provides for a grant of immunity at the government's request. *United States v. Morrison,* 535 F.2d 223, 228–29 (3d Cir. 1976), *cert. denied, Boscia v. United States,* 429 U.S. 824, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976).

■ At the time plaintiffs commenced this action, 28 U.S.C. § 1331 provided in pertinent part:

Federal question; amount in controversy;

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

Plaintiffs claim injury to certain of their constitutional rights as well as financial harm in that "their businesses [have been] nearly ruined." They allege $10,000 in damages, exclusive of interests and costs, and request a very substantial monetary award.

In *Moore v. Betit,* 511 F.2d 1004, 1006 (2d Cir. 1975), the Second Circuit observed: [T]he proposition that indirect damages and damages which are too speculative do not support jurisdiction . . . has traditionally been applied to damages which are intangible or to damages incap-

able of reduction to monetary terms such as free speech, child custody and loss of personal liberty. *See e. g. Kiernan v. Lindsay,* 334 F.Supp. 588, 594–5 (S.D.N.Y. 1971).

.       .       .       .       .

Federal courts have consistently held that absolute certainty in valuation of the right involved is not required to meet the amount in controversy requirement but rather the requirement is that there be a reasonable probability of an amount in controversy exceeding jurisdictional amount if an amount can be ascertained pursuant to some realistic formula. *See e. g., Lawrence v. Oakes,* 361 F.Supp. 432 (D.Vt.1973); *Scherr v. Volpe,* 336 F.Supp. 882, 885 (W.D.Wis.1971) aff'd, 466 F.2d 1027 (7th Cir. 1972). Conversely, courts should dismiss only when it is clear to a legal certainty that jurisdictional amounts cannot be met. *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–9, 58 S.Ct. 586, 82 L.Ed. 845 (1938), *Opelika Nursing Home, Inc. v. Richardson,* 448 F.2d 658 (5th Cir. 1971) on remand 356 F.Supp. 1338, 1341 (M.D. Ala.1973).

The jurisdictional amount requirement is ordinarily satisfied by a plaintiff's good faith allegation. The burden of demonstrating that the amount is as he claims falls upon plaintiff when defendant challenges the allegation. *Moore v. Betit, supra* at 1007. Defendants do not appear to contest plaintiffs' reliance on § 1331 against the individual defendants.

The Court believes that the harm which plaintiffs claim to have sustained can be viewed in monetary terms and is sufficient to meet the jurisdictional amount requirement. The Court notes that after this lawsuit was filed 28 U.S.C. § 1331 was amended to eliminate the $10,000 requirement when an action is brought, "against the United States, any agency thereof, or any officer or employee thereof in his official capacity."

This Court also notes the determination of Judge Coffrin in *Green v. Philbrook,* 427 F.Supp. 834, 836 (D.Vt.1977):

[E]ffective October 21, 1976, Congress amended federal question jurisdiction, 28 U.S.C. § 1331(a), by deleting the $10,000 amount in controversy requirement where the action is brought against the United States, its agencies, or any officer or employee thereof acting in his official capacity. Pub.L.No. 94–574, § 2 (Oct. 21, 1976). The amendment is remedial in nature, *see* H.R.Rep. No. 1656, 94th Cong., 2d Sess. (1976), U.S.Code Cong. & Admin.News 1976, p. 6121, and it is intended to fill what has been termed "an unfortunate gap in the statutory jurisdiction of the federal courts," *Wolff v. Selective Service Local Board No. 16,* 372 F.2d 817, 826 (2d Cir. 1967). Thus, we think it proper to apply the amendment retroactively to grant jurisdiction over the defendant Secretary of Health, Education and Welfare even if there was no jurisdiction initially. *Larkin v. Saffarans,* 15 F. 147 (C.C.W.D.Tenn.1883). In any event, were we to dismiss against the federal defendant now, the plaintiffs would be able to renew their action by refiling under the amended statute. The Court can envision no logical reason to require such a Sisyphean process.

Additionally, the Second Circuit has stated in finding jurisdiction under 28 U.S.C. § 1331:

> We take judicial notice of the fact that membership in the bar of the Internal Revenue Service would be worth more than $10,000 to appellant, a certified public accountant; after the district court's decision in this case, moreover, Congress amended 28 U.S.C. § 1331(a) to eliminate the amount-in-controversy requirement in suits against federal employees in their official capacities, Act of Oct. 21, 1976, Pub.L.No. 94–574, § 2, 90 Stat. 2721.

*Harary v. Blumenthal,* Docket No. 76–6151, 555 F.2d 1113 (2d Cir. 1977). Jurisdiction lies in this action under 28 U.S.C. § 1331.

Furthermore, this suit is of unique concern to the federal courts. A non-statutory jurisdictional basis asserted by plaintiffs is the Court's "inherent supervisory powers over the Federal Courts, Federal judicial and quasi-judicial proceedings, grand juries, and officers of the Court."

We turn now to the prior proceedings in the action. On August 19, 1976, Judge Werker signed a temporary restraining order which prohibited defendants from presenting to the grand jury any evidence obtained directly or derivatively from unlawful wiretaps and electronic eavesdropping devices and from testimony given by any of the named plaintiffs as defendants under an immunity grant from the courts of New York State. A hearing was held on August 28, 1976 and an opinion was filed on August 31, 1976, denying plaintiffs' motion for a preliminary injunction. *Ostrer v. Aronwald,* 425 F.Supp. 962 (S.D.N.Y.1976).

Louis Ostrer was the subject of an illegal wiretap by the New York district attorney's office from October 25, 1972 through February 21, 1973. On the latter date, the district attorney's office conducted a search and seizure. Plaintiffs claim that evidence thus illegally obtained became the basis of the present grand jury probe into possible violations by them of Internal Revenue Service and other criminal statutes.

Additionally, in February and March of 1974, Louis Ostrer testified before a New York County grand jury under a state grant of transactional immunity. Plaintiffs claim that this testimony has come into the hands of the United States attorneys involved in the current probe.

In determining the motion before him, Judge Werker reviewed, "sworn statements by Alan Naftalis, Special Attorney, [three other non-defendants] and William I. Aronwald, Special Attorney, denying any use of tainted evidence and any discussions with members of the other governmental authorities in the investigation of this case." Judge Werker concluded that, "[t]he evidence before the court indicates that the Strike Force has made every effort to conduct an independent investigation, and there is no evidence before the court that would indicate that this goal has not been achieved." *Id.* at 964.

After discussing recent rulings regarding the inadvisability of hampering a grand

jury with "minitrials and preliminary showings" during the course of its investigation, *United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), Judge Werker concluded that in light of the "substantial and credible evidence" that the evidence being presented to the grand jury was not directly or indirectly the product of illegally obtained evidence, he was unable to rule as a matter of law that such presentations must be barred as tainted. Judge Werker observed that a decision could therefore only be arrived at after a hearing as to each bit of evidence and an examination of its origins, a procedure clearly at variance with the holdings of the Supreme Court. Judge Werker stated:

> The proceeding before the Grand Jury appears on its face to be proper. The Government has provided substantial testimony that the evidence before the grand jury is not tainted. To make any other determination, this court would be required to conduct an extensive and lengthy suppression hearing. This court will not interfere with the grand jury proceeding to such an extent.
>
> Furthermore, the plaintiffs have failed to show the absence of an adequate remedy at law. If, as and when an indictment is returned, the plaintiffs may move to dismiss the indictment and to suppress excludable evidence.

*Id.* at 965.

■ Defendants assert that this Court should decline to consider the first and second causes of action, arguing that the issues raised therein are barred by the "law of the case." The prior determinations they cite are the opinion of Judge Werker previously discussed and a decision by Judge Conner, *In the Matter of a Grand Jury Subpoena of William Kilroy,* M11–188 (S.D. N.Y. Aug. 17, 1976). Judge Conner, referring to sworn statements of Naftalis and others, determined that the Government had

> countered the instant application by sufficient proof that the investigation lead-

ing to the present grand jury inquiry was conducted wholly independently of and, indeed, in ignorance of the contemporaneous state probe, and that the information gathered by the federal agencies was not derived, even indirectly, from the concededly illegal state wiretap. See *United States v. Buscaglia,* 518 F.2d 77 (2d Cir. 1975).

Defendants' argument is misplaced. Plaintiffs were not parties in the matter before Judge Conner. Judge Werker's decision was a denial of a preliminary injunction. The standard applied to a motion for this extraordinary relief is unique, as is the remedy itself.

> [A] preliminary injunction . . . is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-being-ness.

*Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 742 (2d Cir. 1953). Plaintiffs seek permanent as well as preliminary relief. Neither the grant nor the denial of a preliminary injunction constitutes an ultimate determination of the merits of a controversy. See *Jacobson & Company Inc. v. Armstrong Cork Co.,* 416 F.Supp. 564, 570 (S.D.N.Y.1976), *aff'd,* 548 F.2d 438 (2d Cir. 1977).

However, although this Court is not bound by Judge Werker's decision its reasoning recommends that the same course be followed.

Interference with the grand jury is by no means a favored practice. The Court of Appeals has stressed, "the strong public policy of this Circuit of not permitting disruption of grand jury proceedings absent compelling reasons." *United States v. Grusse,* 515 F.2d 157, 158 (2d Cir. 1975). In a suit involving a witness' invocation of 18 U.S.C. § 3504, the Court observed:

> Accusations of misconduct based on unsupported suspicion or patently frivolous contentions should not be deemed "claims" sufficient to require any further inquiry and thus delay orderly proceedings of the grand jury. This conclusion is

mandated by the wide latitude historically accorded to grand juries and by the need to avoid delay in grand jury investigations which neither adjudicate guilt or innocence nor proceed in the adversarial tradition of the trial courtroom.

*In re Millow,* 529 F.2d 770, 774 (2d Cir. 1976).

As Judge Werker noted, the Supreme Court has voiced its disapproval of interference with the grand jury.

Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws. Cf. *United States v. Ryan,* 402 U.S 530, 532–533, 91 S.Ct. 1580, 1581–1582, 29 L.Ed.2d 85; *Costello v. United States,* 350 U.S. 359, 363–364, 76 S.Ct. 406, 408–409, 100 L.Ed. 397; *Cobbledick v. United States,* 309 U.S. 323, 327–328, 60 S.Ct. 540, 542–543, 84 L.Ed. 783. The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor, but if it is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it.

*United States v. Dionisio, supra,* 410 U.S. at 17–18, 93 S.Ct. at 773.

■ Plaintiffs' citation to 18 U.S.C. § 2515 *et seq.* as a jurisdictional base clearly refers to the first and second causes of action. Section 2515 itself is entitled "Prohibition of use as evidence of intercepted wire or oral communications." Later sections provide for authorization for interception, authorization for disclosure and use, procedure for interception, and for reports of interception. Finally, § 2520 bears the title "Recovery of civil damages authorized."

It has already been established that Title 119, which includes § 2515 *et seq.,* does not provide for suppression hearings during grand jury proceedings. In *In re Vigorito,* 499 F.2d 1351, 1354 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974), the Second Circuit referred to its prior decision *In re Persico,* 491 F.2d 1156 (2d Cir.), *cert. denied,* 419 U.S. 924, 95 S.Ct. 199, 42 L.Ed.2d 158 (1974), and observed:

We found that the legislative history of section 2518(10), the only provision in Title 119 that specifically provides for suppression hearings, indicates that Congress did not intend Title 119 to interfere with traditional methods of conducting grand jury proceedings so long as the interception is not patently illegal:

"As noted, though Congress prescribed that illegal wiretap evidence must be excluded from all grand jury proceedings, hearings to suppress evidence were not to be permitted during such proceedings. These seemingly inconsistent policy determinations can be reconciled only by interpreting the statute as requiring exclusion only when it is clear that a suppression hearing is unnecessary, as when the Government concedes that the electronic surveillance was unlawful or when the invalidity of the surveillance is patent, such as, for example, when no prior court order was obtained, or when the unlawfulness of the Government's surveillance has been established in a prior judicial proceeding. In these situations both statutory policies—the exclusion of illegally acquired evidence and the maintenance of unimpeded grand jury proceedings—are served. But where illegality is claimed and, if established, can be established only by way of a plenary suppression hearing, one important aim of the legislation would be frustrated." 491 F.2d at 1161–1162.

Section 2518(10)(a) provides:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress

the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Discussing this provision in *Gelbard v. United States,* 408 U.S. 41, 59–60, 92 S.Ct. 2357, 2367, 33 L.Ed.2d 179 (1972), the Supreme Court distinguished witnesses from defendants and potential defendants.

The congressional concern with the applicability of § 2518(10)(a) in grand jury proceedings, so far as it is discernible from the Senate report, was apparently that defendants and potential defendants might be able to utilize suppression motions to impede the issuance of indictments: "Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. [*United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966).] There is no intent to change this general rule." S.Rep. No. 1097, 90th Cong., 2d Sess., 106 (1968); U.S.Code Cong. & Admin.News, p. 2195. The "general rule," as illustrated in *Blue,* is that a defendant is not entitled to have his indictment dismissed before trial simply because the Government "acquire[d] incriminating evidence in violation of the [law]," even if the "tainted evidence was presented to the grand jury." 384 U.S. at 255 and n. 3, 86 S.Ct. 1419; see *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). But that rule has nothing whatever to do with the situation of a grand jury witness who has refused to testify and attempts to defend a subsequent charge of contempt.

The only conceivable predicate within Title 119 for a civil action of this sort would be § 2520, authorizing civil damage suits, which provides:

Recovery of civil damages authorized

Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred.

A good faith reliance on a court or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law.

Determination of any such damages at this time, however, would require substantial interference with the grand jury.

In *Application of United States Authorizing the Interception,* 413 F.Supp. 1321 (E.D. Pa.1976), a movant sought disclosure of a wiretap order, supporting affidavits, and the results of the surveillance. The government opposed, claiming that disclosure would threaten an on-going grand jury investigation. Disclosure was denied. The movant also argued that access was necessary for the preparation of a § 2520 suit, that he should not be forced to wait for such relief, and that the statute of limitations might preclude him from any remedy in the future.

The court, nonetheless, determined that the movant's interest was outweighed by the potential prejudice to the grand jury probe. On the statute of limitations problem, the court stated:

This contention may be disposed of by reference to the broad rule that *whenever some paramount authority prevents a person from exercising his legal remedy, the statute is tolled for that period dur-*

*ing which he has been so thwarted. Braun v. Sauerwein,* 77 U.S. (10 Wall.) 218, 19 L.Ed. 895 (1970); *Davis v. Wilson,* 349 F.Supp. 905 (E.D.Tenn.) *aff'd mem.,* 471 F.2d 653 (6th Cir. 1972); 51 Am. Jur.2d, Limitation of Actions § 140 (1970). It would be manifestly unjust to hold that the clock is running on movant's cause of action during a period when this court and the Government have prevented him from obtaining the information necessary to bring that claim. We do not believe that it was the intent of Congress in enacting §§ 2518(8)(d) and 2520 to fashion this type of draconian legislation. To hold that the limitations period is running on any potential civil claim during the period when a prospective claimant is prevented by court order from discovering the wiretap materials he needs in order to pursue such a claim would produce just such a result. .Specifically, movant, in the case at bar, may rely upon our decision that the statute of limitations must and will be suspended as to any civil cause of action he may have under this Act until such time as he is able to obtain the information necessary to ascertain the viability of civil suit under Section 2520. On this basis we reject movant's final ground for relief.

Similarly, plaintiffs' claims must be deferred.

■ Plaintiffs' third cause of action accuses defendants of conspiracy to harass and defame them in order to deprive them of their livelihood. The means allegedly employed by defendants include calling the plaintiffs to appear before different grand juries at the same time; appropriating plaintiffs' business records; leaking defamatory stories to the media; making statements in court and before congressional committees which were later published; trying to discourage plaintiffs' business associates from dealing with them; and engaging in overlapping and repetitive investigations of plaintiffs.

Defendants are portrayed by plaintiffs as waging a virtual vendetta against them. Insofar as plaintiffs are targets of a grand jury probe, this is probably a natural reaction. What is to a United States attorney the vigorous pursuit of suspected criminals is to the potential defendant a relentless persecution. Plaintiffs' conspiracy claims consist largely of conclusory allegations.

Louis Ostrer's affidavit traces a succession of scrapes with the government. He names some names of those he feels have wronged him, but these names are not those of the defendants. A prior criminal conviction plus earlier investigations are presented as a huge conspiracy and laid at the door of the defendants.

Certain of the plaintiffs' claims are reminiscent of *Jacobson v. Organized Crime & Racketeering Section,* 544 F.2d 637, 638 (2d Cir. 1976), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). Jacobson and Ranger Bakers, Inc., a company of which he was president, sued the Internal Revenue Service and four agents. As the Second Circuit observed:

> Ranger maintains that its financial problems were caused by the concerted efforts of the Organized Crime and Racketeering Section of the Department of Justice and the Internal Revenue Service, which, it claims, were resolved to drive it out of business. Appellants alleged that the Organized Crime Section, carrying on a "personal vendetta" against the Jacobson family (App. 7a, 26a), "leaked" to a New York City newspaper a story which appeared in May 1975 to the effect that Jacobson was a front for his father, Sam, who, the article asserted, manages an underworld gambling cartel. Appellants also alleged vaguely that the Organized Crime Section intimidated and spread "false and malicious stories" among plaintiffs' customers, vendors, and banks in an effort to dissuade them from dealing with or extending credit to appellants. They claim it was as a result of the consequent loss of business and credit that they were unable to meet their federal tax obligations.

The Second Circuit noted the "use of the rhetoric of conspiracy and harassment, supplemented by claims of many millions of

dollars of damages against these individual revenue agents." *Id.* at 640. The Court affirmed the dismissal of the complaint saying, *inter alia*, that, "[w]ith respect to the large money damage claims against the IRS and the individual revenue agents, the vague and conclusory allegations clearly state no claim for relief." *Id.* at 639.

Similarly, here, plaintiffs' broad brush portrayal of the defendants as vengeful conspirators lacks sufficient substance to state a claim.

█ A claim of conspiracy to violate constitutional rights cannot depend upon vague and conclusory allegations but must be based upon at least some allegations of facts indicating such a deprivation. *See Jacobson v. Organized Crime & Racketeering Section of U.S. Dep't of Justice, supra; Black v. United States,* 534 F.2d 524 (2d Cir. 1976); *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir. 1976).

█ Defendants claim that Levi and Fiske are not liable to plaintiffs because they are not alleged to be personally responsible and because *respondeat superior* does not apply, citing *Black v. United States, supra.* The complaint describes Levi and Fiske as follows:

10. ROBERT B. FISKE, JR., is the United States Attorney for this District, and as such he has general supervision and authority over prosecutions and investigations in the District, and over the presentation and signing of indictments.

    \*    \*    \*    \*    \*    \*

14. EDWARD H. LEVI is the Attorney General of the United States, and as such he has general and ultimate authority over and supervision of the Department of Justice and any and all Organized Crime Strike Forces.

The Second Circuit, in *Black v. United States, supra* at 527–28, stated:

In an effort to limit vexatious litigation and to minimize interference with the orderly workings of government, it is required in suits against state officials under 42 U.S.C. § 1983 that the plaintiff allege the defendant's direct and personal responsibility for the purportedly unlawful conduct of his subordinates. In *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973), we stated with regard to state officials that "the general doctrine of *respondeat superior* does not suffice . . . ." We see no reason why the pleading requirements should be any different in actions against federal officials. Cf. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 456 F.2d 1339, 1346–7 (2d Cir. 1972). Insofar as appellants' complaint is silent in this critical regard, it is fatally defective.

The allegations regarding Levi and Fiske do not suffice to state *direct* and personal responsibility for the purported misconduct of their subordinates. *See Morpurgo v. Board of Higher Education,* 423 F.Supp. 704, 713 (S.D.N.Y.1976). Moreover, there are immunity defenses available to the individual defendants.

Certain of the defendants are federal prosecutors. The Supreme Court, in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (*"Imbler"*) found a state prosecuting attorney acting within his duties absolutely immune from a § 1983 suit brought by an accused. Mr. Justice Powell, speaking for the Court, examined the concept of prosecutorial liability. He discussed the common-law immunity of prosecutors and noted *Yaselli v. Goff,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (per curiam). In that case, a special assistant to the United States Attorney General was accused of having obtained a grand jury indictment maliciously and without probable cause through the intentional introduction of false evidence. The complaint was dismissed by the district court and this decision was affirmed by both the Court of Appeals and the Supreme Court.

Mr. Justice Powell went on to observe: A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were con-

strained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate. Cf. *Bradley v. Fisher*, 13 Wall., [335] at 348, 20 L.Ed.646; *Pierson v. Ray*, 386 U.S., [547] at 554, 87 S.Ct. [1213] at 1217 [18 L.Ed.2d 288]. Further, if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

*Imbler*, 424 U.S. at 424–25, 96 S.Ct. at 992. The Court noted that prosecutors often act under time pressure and other constraints and could make decisions which would create colorable claims of deprivation of constitutional rights. *Id.* at 427, 96 S.Ct. 984. The entire criminal justice system could be adversely affected by a prosecutor's fear that any misstep might subject him to liability.

The Court summed up its determination as follows:

> We conclude that the considerations outlined above dictate the same absolute immunity under § 1983 that the prosecutor enjoys at common law. To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system. Moreover, it often would prejudice defendants in criminal cases by skewing post-conviction judicial decisions that should be made with the sole purpose of insuring justice. With the issue thus framed, we find ourselves in agreement with Judge Learned Hand, who wrote of the prosecutor's immunity from actions for malicious prosecution:

> > "As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire v. Biddle*, 177 F.2d 579, 581 (CA2 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

*Id.* at 427–28, 96 S.Ct. at 993.

Although the defendant in *Imbler* was a state and not a federal prosecutor, it seems clear particularly in light of the Court's citation of *Yaselli v. Goff, supra*, that the defendant federal prosecutors would be eligible for the absolute immunity discussed in that case. Similarly, although this is of course not a § 1983 suit, it is a civil suit charging constitutional deprivation and thus the *Imbler* reasoning would apply. Furthermore, *Imbler* has been held applicable to United States attorneys. *Brawer v. Horowitz*, 535 F.2d 830, 834 (3d Cir. 1976); *Stockheimer v. Underwood*, 428 F.Supp. 192, 195 (W.D.Wis.1977).

The relevance of *Imbler* to the facts of this case must be examined. The Supreme Court stated in a footnote:

> We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required, constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some

decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them. *Id.* 424 U.S. at 431, n. 33, 96 S.Ct. at 995. The question, thus, remains whether the defendants' conduct is of the sort to which absolute immunity applies. This Court believes that it is. The policy considerations which underlie the immunity doctrine strongly argue that prosecutors engaged in a grand jury investigation, in dealing with potential defendants, should not be subject to suits of this kind. In *Mobil Oil Corp. v. Lefkowitz*, Docket No. 74 Civ. 4088 (S.D. N.Y. Apr. 26, 1977), *Imbler* was found to be applicable to the New York State Attorney General when conducting a grand jury investigation. *See also, Stockheimer v. Underwood, supra.*

■ As members of the Strike Force, Sontag and Killeen may also be able to avail themselves of the defense of absolute immunity. If not, and if they are only entitled to qualified immunity, the Court nonetheless finds that they have established their good faith and reasonable grounds for their actions. In discussing the qualified immunity of certain officials of the executive branch in *Economou v. U.S. Department of Agriculture*, 535 F.2d 688, 696 (2d Cir. 1976), the Second Circuit stated:

If, . . . the plaintiff's claims are baseless, as defendants maintain, our holding does not necessarily require them to face an expensive, protracted or wasteful trial. Should the defendants by affidavit set forth undisputed facts demonstrating the reasonableness of their action, buttressed by affidavits of their good faith, and the plaintiff then fail to respond under oath with "specific facts showing that there is a genuine issue for trial" regarding the defendants' good faith or the existence of reasonable grounds for their action, summary judgment dismissing the complaint might be appropriate.

A reading of the affidavits submitted by Sontag and Killeen and those submitted on behalf of plaintiffs causes the Court to conclude that the immunity defense has been established.

Plaintiffs, in their fourth cause of action, claim that Louis Ostrer is the victim of a campaign by defendants to obtain information from him about certain of his associates. This campaign allegedly includes threats to indict members of his family including the other plaintiffs.

Undoubtedly, plaintiffs find the scrutiny of a grand jury investigation uncomfortable. However, the Supreme Court in *United States v. Calandra, supra,* 414 U.S. at 345, 94 S.Ct. at 618, stated:

The duty to testify has long been recognized as a basic obligation that every citizen owes his Government. *Blackmer v. United States,* 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932); *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950). In *Branzburg v. Hayes, supra,* 408 U.S. [665], at 682 and 688, 92 S.Ct. [2646], at 2657 and 2660 [33 L.Ed.2d 626], the Court noted that "[c]itizens generally are not constitutionally immune from grand jury subpoenas . . . " and that "the longstanding principle that 'the public . . . has a right to every man's evidence' . . . is particularly applicable to grand jury proceedings." The duty to testify may on occasion be burdensome and even embarrassing. It may cause injury to a witness' social and economic status. Yet the duty to testify has been regarded as "so necessary to the administration of justice" that the witness' personal interest in privacy must yield to the public's overriding interest in full disclosure. *Blair v. United States,* 250 U.S. [273] at 281, 39 S.Ct. [468], at 471 [63 L.Ed. 979]. Furthermore, a witness may not interfere with the course of the grand jury's inquiry. He "is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his." *Id.,* at 282, 39 S.Ct., at 471. Nor is he entitled "to challenge the authority of the court or of the

grand jury" or "to set limits to the investigation that the grand jury may conduct." *Ibid.*

That a citizen may be a potential defendant does not alter his obligation. *See United States v. Mandujano,* 425 U.S. 564, 573–575, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). *See also, In re Cueto & Nemikin,* 554 F.2d 14 (2d Cir. 1977).

■ Defendants argue that the third and fourth causes of action in the complaint are premature. They cite *Martin v. Merola,* 532 F.2d 191 (2d Cir. 1976). There, the Bronx District Attorney and two of his assistants were sued under 42 U.S.C. § 1983 after they issued press releases characterizing certain defendants as "vultures" and linking them to "crime families." The Second Circuit ordered the complaint dismissed stating that until the state prosecutions were finished it would be impossible to determine if fair trial rights had been violated, if an impartial jury could be selected, if a change of venue was in order, and if ascertainable damages had been sustained. *Id.* at 194. Principles of comity were also invoked. *Id.* at 194–95. In an observation which bears upon the instant case, the Court noted:

> We believe the requirement that defendants wait until criminal proceedings have terminated before asking a federal court for damages against the prosecutor will tend to eliminate those suits which might be brought for purposes of harassment.

*Id.* at 195.

In *Centracchio v. Garrity,* 198 F.2d 382 (1st Cir.), *cert. denied,* 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 672 (1952), a taxpayer petitioned pre-indictment for suppression of certain evidence he had given to agents to the Bureau of Internal Revenue on the understanding that no prosecution would result. He also sought an order restraining the United States attorney from presenting the evidence to the grand jury or at trial. The court stated that, "[j]udicial interference of this sort with the action of a United States attorney in the administration of the criminal law, at a pre-indictment stage, must, we think, be regarded as the exception rather than the rule." *Id.* at 387. The court concluded that the district court should have dismissed the petition for lack of equity without prejudice to the taxpayer's right to challenge the evidence's admissibility after indictment before or during the trial. *Id.*

The objection to this action as premature is further buttressed by a recent Second Circuit decision. *Matter of Doe,* 546 F.2d 498, 501 (2d Cir. 1976)

> We are asked to enjoin the investigation of a criminal offense by a grand jury, whose broad investigative powers have often been emphasized by the Supreme Court and by this court. *E. g., Calandra v. United States,* 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *In re Subpoena of Persico,* 522 F.2d 41, 55–56 (2d Cir. 1975). The request is made in the context of a mere investigation and is brought here prematurely. If the grand jury refuses to indict Doe for obstruction of justice and to indict Roe and X Corporation for tax violations, none of them will have to prepare a defense. Even if indictments are obtained, appellants will be able to make the same claims of prosecutorial misconduct and infringement of their constitutional right to prepare an adequate defense by motions in the district court and by an appeal from convictions, if any.

Accordingly, the claims raised by plaintiffs must be deferred until a later date.

■ Plaintiffs ask the Court to discharge the grand jury. This request must be denied. *Nixon v. Sirica,* 159 U.S.App. D.C. 58, 487 F.2d 700, 790 (1973) states:

> Although a court has no authority to order the grand jury to return an indictment (or to refuse to do so), it may exercise control over the grand jury in several significant respects. The court summons and empanels the grand jury and apparently has broad discretion to discharge it for any reason.

In regard to discharge, that court in turn cited Rule 6(g), Fed.R.Crim.P., which reads in pertinent part:

Discharge and Excuse. A grand jury shall serve until discharged by the court but no grand jury may serve more than 18 months.

Also cited was *United States v. Smyth,* 104 F.Supp. 283, 292 (N.D.Cal.1952), whose authority for the power to discharge was again Rule 6(g), a federal case, *In re National Window Glass Workers,* 287 F. 219, 225 (N.D.Ohio 1922), which stated "[t]he District Court may discharge a grand jury whenever in its judgment it deems a continuance of the sessions of such a jury unnecessary," an Indiana case, and the following observation:

In a nationally famous incident, Judge Geiger, of the Federal District Court in Wisconsin, discharged a jury to prevent the return of an indictment. He was threatened with impeachment proceedings by Attorney General Cummings, but the grand jury was discharged. New York Times, 1937, December 18, p. 1, col. 3; December 20, p. 1, col. 2, p. 4, col. 6; 1938, January 12, p. 4, col. 4; January 23, p. 5, col. 1; January 25, p. 6, col. 6; January 26, p. 4, col. 2; January 31, p. 1, col. 2; February 16, p. 7, col. 2.

*United States v. Smyth, supra* at 292, nn. 33 & 34. These are hardly compelling authorities for so drastic a procedure as discharge of a grand jury.

Plaintiffs would also have the Court grant them immunity from prosecution. At the pre-indictment stage, this would surely be floundering in the dark. The Court does not know what evidence the grand jury has heard or will hear, nor does it know with what offenses plaintiffs might ultimately be charged. In *Dixon v. District of Columbia,* 129 U.S.App.D.C. 341, 394 F.2d 966 (1968), cited by plaintiffs, a traffic charge brought as retaliation was dismissed with no objection by the government. Plaintiff also points to *United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967), in which officials who had pursued a campaign of harassing voting rights workers through prosecutions for violations of local vagrancy, traffic and other laws were ordered to restore those individuals to their *status quo ante.* In

neither instance was immunity granted before an offense had been charged.

Nevertheless, plaintiffs insist that meaningful relief can only be granted pre-indictment. The stigmatization which accompanies an indictment cannot be denied. This consequence, however, does not justify the Court in impeding the grand jury. The Court cannot order the grand jury to refuse to return an indictment. *Nixon v. Sirica, supra* at 790.

Plaintiffs also ask the Court for broad restraints on the actions of the defendants. Neither the facts of this case nor the applicable law would justify such restrictions.

The prosecutor's decision to seek an indictment is subject to judicial scrutiny only on a substantiated claim of "racial or similar discrimination." *United States v. Strutton,* 494 F.2d 686, 688 (2d Cir. 1974). See *United States v. Smith,* 523 F.2d 771, 782 (5th Cir. 1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976); *United States v. Niedelman,* 356 F.Supp. 979, 984 (S.D.N.Y.1973). One primary obstacle to judicial intervention in matters of prosecutorial discretion is the separation of powers doctrine.

Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.

*Newman v. United States,* 127 U.S.App. D.C. 263, 382 F.2d 479, 480 (1967), *quoted in Russell v. Parratt,* 543 F.2d 1214, 1216 (8th Cir. 1976).

The United States attorney is both an officer of the Court and an official of the executive department. It is in the latter capacity that he exercises prosecutorial discretion.

[T]he problems inherent in the task of supervising prosecutorial decisions do not lend themselves to resolution by the judiciary. The reviewing courts would be placed in the undesirable and injudicious posture of becoming "superprosecutors."

*Inmates of Attica Correctional Facility v. Rockefeller,* 477 F.2d 375, 380 (2d Cir. 1973). Moreover, the status of the United States attorney as an executive official does not divest him of the absolute immunity discussed *supra. See Economou v. U. S. Department of Agriculture, supra* at 689. In *United States v. Cohen,* 231 F.Supp. 171, 172 (S.D.N.Y.1964), the Court said:

> It is concluded, . . . that neither under Rule 41(e) nor otherwise may this Court summarily enjoin the United States Attorney from conducting correspondence, whether about income taxes or anything else. This Court has no general supervisory powers over the United States Attorney; he is a public official having independent responsibilities as such. The motion is denied therefore so far as it seeks to enjoin correspondence of the United States Attorney.

In *United States v. Steel,* 238 F.Supp. 580 (S.D.N.Y.1965), a defendant moved to have an indictment against her dismissed. She claimed that an assistant United States attorney had approached her in regard to testifying in another case. She did not cooperate and he told her, "that her status as a co-conspirator but not defendant in the then pending indictment 'would undoubtedly be re-evaluated if she continued to refuse to cooperate.'" *Id.* at 581. She remained adamant and a second indictment issued naming her as a defendant. Her motion to dismiss was predicated upon denial of due process in that the indictment was the result of her refusal to testify and in that no evidence of crime had been presented to the grand jury. Her evidence was the statement by the assistant United States attorney.

The Court denied her the relief requested noting that the grand jury, not the prosecutor, votes an indictment, that a presumption of regularity attaches to grand jury proceedings, and that the movant's speculation as to why she had been indicted did not overcome this presumption. *Id.* at 582. These considerations seem at least as compelling here where pre-indictment relief is sought.

Neither the facts of this case nor the applicable law warrant the restrictions plaintiffs ask the Court to place upon the defendants.

■ The fifth cause of action in the complaint arises out of the defendants' purported acquisition, without plaintiffs' consent, of an affidavit prepared for litigation purposes by the latters' attorneys. This incident is said to violate plaintiffs' sixth amendment right to the effective assistance of counsel.

Apparently, according to the complaint, counsel for one of the plaintiffs, Alan Dershowitz, entrusted certain confidential documents relating to this action to another attorney, Nancy Rosner. When Rosner appeared later that same day in Part I to argue against defendant Naftalis she had among her papers one of these documents, a draft of a proposed affidavit of plaintiff Louis C. Ostrer. At some time during the argument, Naftalis acquired the draft affidavit, which was subsequently read by both Naftalis and Aronwald.

This "intrusion" is said to be actionable. Left to be determined are the degree of culpability and the extent of prejudice suffered. The Fourth Circuit's opinion in *Bursey v. Weatherford* is cited, 528 F.2d 483 (1975). However, that decision was subsequently reversed by the Supreme Court. 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Both that case and a recent Second Circuit decision, *Klein v. Smith,* 559 F.2d 189 (1977), which discussed *Bursey v. Weatherford,* dealt with a criminal defendant's efforts to overturn his conviction.

At this stage, plaintiffs cannot prove a violation of sixth amendment rights since the sixth amendment right to counsel does not arise prior to the institution of criminal proceedings. *United States v. Mandujano, supra,* 425 U.S. at 581, 96 S.Ct. 1768, *citing Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

Certainly the sole remedy for the unique wrong asserted in plaintiffs' fifth cause of action is suggested by the Second Circuit in *Matter of Doe, supra* at 501. If actionable

wrong there was, it must fall within the categories of prosecutorial misconduct and infringement of the right to prepare an adequate defense. The remedies, the Court of Appeals has indicated, are post indictment. Furthermore, since the draft affidavit, in final form, is now apparently part of the record, the degree of prejudice to plaintiffs seems minimal if not non-existent.

Plaintiffs seek drastic interference with a grand jury and far reaching restrictions on the activities of government prosecutors. They ask for huge monetary damages. Neither the facts nor the applicable law argue persuasively that they are entitled to such remedies. The complaint fails to state a claim upon which relief can be granted. Accordingly, defendants' motion to dismiss is granted.

It is so ordered.